**GREEN SAVITS, LLC**
Laura M. LoGiudice, Esq.  (BAR ID #022721999)
25B Vreeland Road, Suite 207
Florham Park, New Jersey 07932
Telephone:  (973) 695-7777
Facsimile:   (973) 695-7788
Email: LLogiudice@greensavits.com
*Attorneys for Plaintiff, James J. Mirena*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAMES J. MIRENA<br><br>*Plaintiff,*<br><br>v.<br><br>EXECUTIVE JET MANAGEMENT, INC.; NETJETS, INC.; ABC CORPORATIONS 1-10; AND JANE DOES 1-10 AND JOHN DOES 1-10,<br><br>*Defendants.* | **COMPLAINT AND JURY DEMAND**<br><br>**Civil Action No.:** |

Plaintiff James J. Mirena ("Plaintiff") alleges the following by way of Complaint against Defendants Executive Jet Management, Inc. and NetJets, Inc. (collectively referred to herein as "Defendants" or "EJM"):

**NATURE OF THE ACTION**

1.  Plaintiff seeks redress from his former employer, EJM, for violating the New Jersey Law Against Discrimination ("NJLAD"), *N.J.S.A.* 10:5-12, *et seq.* in connection with its illegal termination of him based on his age and/or disability.

1

2. Plaintiff also seeks redress pursuant to the New Jersey Conscientious Employee Protection Act ("CEPA"), *N.J.S.A.* 34:19-1, *et seq.*, in connection with his illegal termination.

3. Plaintiff also seeks redress for retaliation in violation of the Federal Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et. seq.*

## PARTIES

4. Plaintiff currently resides in Sparta Township, Sussex County, New Jersey.

5. At all times relevant to this Complaint, Plaintiff was employed by EJM.

6. EJM provides private jet charter services and aircraft management services.

7. Upon information and belief, EJM maintains its principal place of business in Cincinnati or Columbus, Ohio.

8. Upon information and belief, Executive Jet Management Inc. is a subsidiary of NetJets, Inc.

9. Upon information and belief, NetJets, Inc. maintains its principal place of business in Columbus, Ohio.

10. Defendants ABC Corporations (1-10) are business entities in any form that may have legal responsibility for the causes of action alleged herein, but whose identities and/or responsibilities are not presently known by Plaintiff.

11. Defendants John and Jane Does (1-10) are individuals who participated in the conduct alleged herein and who may have legal responsibility for the causes of action alleged herein, but whose identities and/or participation are not presently known by Plaintiff.

12. At all times relevant to this Complaint, Plaintiff worked out of EJM's offices located in Teterboro, Morris County, New Jersey and Teterboro Airport located in Teterboro, Morris County, New Jersey.

## JURISDICTION AND VENUE

13. Jurisdiction in this Court is appropriate under 28 U.S.C. §1332(a), because the amount in controversy exceeds $75,000 and no plaintiff shares a state of citizenship with any defendant.

14. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367(a), because Plaintiff has alleged a federal claim under 29 U.S.C. §2601, *et. seq.*, and because Plaintiff's state claims are substantially related to the federal claims and form part of the same case or controversy.

15. The venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2) because the cause of action arose in this district.

## FACTUAL BACKGROUND

16. Under EJM's aircraft management services, owners of private jets engage EJM to fully service their jets, including, *inter alia*, providing a flight crew that is available at any time.

17. At all times relevant to the Complaint, Plaintiff was one of three (3) pilots who flew a private jet for an owner who had engaged EJM's aircraft management services. Plaintiff was a Co-Captain as was Thomas Mizelle ("Mizelle"). The Lead Pilot was James Wolfe ("Wolfe"). Plaintiff, Mizelle and Wolfe had been assigned to the same client for approximately eleven (11) years.

18. At the time of his unlawful termination on June 1, 2020, Plaintiff was sixty-five (65) years old and had been flying for approximately forty (40) years. During thirty-five (35) of those years, Plaintiff flew private corporate jets, and had worked for EJM for approximately sixteen (16) of those years.

19. In 2019, Plaintiff took FMLA leave for approximately two and a half months to address a serious medical condition of his own. Specifically, Plaintiff suffered a re-occurrence of cancer from nine years earlier and underwent treatment, including radiation.

20. After successfully receiving treatment Plaintiff was cleared by the FAA local dedicated medical physician and examiner, his doctor, and radiation oncologist to return to his flight duties.

21. However, Plaintiff could not return to flying until the FAA reissued his Medical certificate.

22. While Plaintiff timely provided relevant information to the FAA, the FAA was slow in reissuing his Medical certificate.

23. Plaintiff made multiple attempts to expedite the process and worked with a company contracted by EJM to assist pilots such as Plaintiff in obtaining a reissued Medical certificate from the FAA.

24. While Plaintiff was waiting on the FAA, he received notification from EJM that he had only eleven (11) days to provide the FAA Medical certificate, or he would be terminated from employment with EJM pursuant to company policy which allegedly provided that any employee who is absent from work for more than six (6) months would be fired.

25. Plaintiff was not in control of when the FAA would act and had diligently pursued all available avenues to secure his reissued Medical certificate.

26. Upon information and belief Plaintiff's absence had not caused any issues in servicing the EJM client to which Plaintiff had been assigned at the time he took FMLA leave.

27. EJM would have suffered no undue hardship in granting Plaintiff additional time to obtain his FAA Medical certificate.

28. Fortunately for Plaintiff, the FAA reissued his certificate before expiration of the eleven (11) days. Plaintiff then successfully completed an FAA 299 Captain's Check Ride with the Assistant Chief Pilot/FAA check airman and returned to flying status in November 2019.

29. However, in early 2020, when COVID-19 hit, Plaintiff was at a high risk due to his age and his prior cancer and treatment.

30. Prior to going out on FMLA leave, Plaintiff observed that Wolfe was experiencing cognitive issues, observable by conduct, including, without limitation, forgetfulness in relation to important job responsibilities, such as securing hotel rooms and car rentals at destination locations, failing to schedule pilots for scheduled flights, and most importantly, an observed inability to perform the duties of the non-flying pilot.

31. Mizelle, the air mechanic, and flight attendants also observed these cognitive deficits on the part of Wolfe.

32. In March 2020, Plaintiff observed that Wolfe's cognitive decline was worsening and informed the Chief Pilot, Pete Djordjevic ("Djordjevic"), that he was concerned that Wolfe was experiencing cognitive issues which were compromising his ability to fly safely.

33. Plaintiff was primarily concerned with Wolfe's inability to input data into the Flight Management System, one of the primary duties of the non-flying pilot. Failure to properly enter data into the Flight Management System can lead to an aircraft FAA violation or an aircraft accident.

34. Plaintiff regularly had to assist Wolfe with this function while he was also performing the duties of the flying pilot, causing a clear risk to the lives of the pilots, crew, passengers, and the public, particularly in the event Plaintiff and/or Mizelle became incapacitated during a flight.

5

35. In response to Plaintiff's complaint, Djordjevic organized a company FAA 299 Check Ride conducted by the Assistant Chief Pilot. While Plaintiff, Mizelle and Wolfe all passed, the Assistant Chief Pilot, Chris Meadows ("Meadows") observed the difficulty Wolfe had inputting data into the Flight Management System.

36. Nonetheless, Djordjevic refused to recognize that Wolfe's cognitive abilities were compromised. Instead, he decided that all Wolfe needed was additional training, although Wolfe was immediately temporarily grounded.

37. Wolfe's grounding did not affect any scheduled flights, as due to COVID-19 there were no flights scheduled at the time, and even if there were, Plaintiff and Mizelle could have covered the flights.

38. Djordjevic decided to send Wolfe to the company owned training facility - Flight Safety International in Columbus, Ohio - and he made the unprecedented decision to send Plaintiff along with Wolfe.

39. It was extremely unusual for Plaintiff, Mizelle and/or Wolfe to be sent to a training session together because EJM needed to always have two pilots available to fly for the client to which the three pilots were assigned.

40. Additionally, Plaintiff had <u>never</u> been sent to the company owned training center before. All other times Plaintiff was sent to an unaffiliated training center.

41. Upon information and belief, NetJets, Inc. pilots are the primary customers of Flight Safety International in Columbus, Ohio.

42. Moreover, when attending training it is important to be paired with a competent co-pilot, and Plaintiff was sent with a co-pilot, *i.e.* Wolfe, who was demonstratively not

competent in performing the duties of the non-flying pilot and was also aware of Plaintiff's allegations concerning his abilities.

43. Not only were the circumstances surrounding the decision to send Plaintiff and Wolfe together to a company owned training center unusual, but the training itself was completely atypical of anything Plaintiff had experienced in his forty (40) years of experience.

44. For example, Plaintiff and Wolfe were the only two pilots at the training, whereas in Plaintiff's prior forty (40) years of experience there were usually eight to ten pilots in each training class.

45. Also unusual, and not something Plaintiff had ever experienced in his prior forty (40) years of experience, was that Meadows and the Assistant Director of Operations, Raymond Sauter ("Sauter"), were also sent to the training with Plaintiff and Wolfe, ostensibly to observe, since they did not participate in taking the training.

46. Plaintiff was told by Meadows and Sauter that none of the trainers were informed that there were concerns with the cognitive abilities of Wolfe, and that Plaintiff was prohibited from so informing the trainers.

47. During the training Wolfe continually demonstrated his inability to input data into the Flight Management System (the major duty of the non-flying pilot), and even had difficulty performing the duties of the flying pilot. During one simulator training Wolfe touched a wing to the runway on a cross wind take off. Wolfe also gave up on the simulated training session where he was presented with a one pilot incapacitation scenario and was unable to complete the landing as the sole pilot.

48. Wolfe also repeatedly stopped to ask questions of the trainers during the simulated training. Although this is permitted during the training simulations, the extent of Wolfe's questioning and inability to complete sessions was not typical.

49. Plaintiff had no issues during the simulated training sessions. In fact, Plaintiff was commended on several occasions for his flying skills.

50. For the most part, Plaintiff refrained from offering Wolfe any assistance during the training simulations, as opposed to actual flights where he regularly helped Wolfe.

51. Typically, when a pilot is not able to perform during simulated training sessions, he/she is not permitted to move on to what is called the "Check Ride." During the Check Ride, there is a complete simulated flight, where no questions can be asked of the trainers.

52. Nonetheless, at the end of the eight (8) days of training, Wolfe and Plaintiff were paired together for a Check Ride. Again, atypical of normal training sessions, Meadows observed the Check Ride. As Plaintiff expected, during the Check Ride when Plaintiff was the flying pilot and Wolfe was the non-flying pilot, Wolfe was unable to perform his duties. The Check Ride was abruptly ended when Wolfe was unable to input arrival to approach data into the Flight Management System and was calling out for Plaintiff to help him. As a result, Plaintiff was unable to complete most of the tasks tested during a Check Ride.

53. Plaintiff stated to Meadows that he should not have been sent on a Check Ride with a proven substandard pilot.

54. After the session was abruptly ended, Plaintiff asked Meadows when he would be provided a re-check, which is the normal process when there are issues with the Check Ride, particularly since none of the Check Ride issues pertained to anything Plaintiff had failed to perform correctly.

55. Meadows initially told Plaintiff to sit tight, and he would let him know when the re-check would occur. Thereafter, Meadows told Plaintiff to go home, and a re-check would be scheduled.

56. Plaintiff, however, was never given a re-check. Instead, he was called by Djordjevic who informed him that he was going to be terminated.

57. By letter dated May 28, 2020, Plaintiff was informed that his employment with EJM would be terminated as of June 1, 2020, claiming that he did not pass training.

58. The Flight Safety Training Center issued a letter stating that Plaintiff "did not complete the minimum course requirements" but did not state that Plaintiff had failed any of the tested items.

59. However, Plaintiff was also issued a certificate from EJM, not the Flight Safety Training Center, indicating he had failed seven (7) items. However, Plaintiff had only been given the opportunity to perform half of one of the items he allegedly failed. In fact, the certification itself states that Plaintiff was not tested on seventeen (17) items, some of which were also items that were listed as items Plaintiff allegedly failed.

60. Thus, the EJM certification was falsified.

61. Upon information and belief, Wolfe was allowed to retire after failing the Check Ride and was not issued a failing certification.

62. In Plaintiff's entire forty (40) year career he had never failed a training, and within the preceding four months prior to being sent to training he had passed two FAA 299 Check Rides and recently had his FAA Medical certificate reissued.

63. Adding insult to injury, EJM refused to reimburse Plaintiff approximately $400 in expenses incurred during the training trip.

64. Plaintiff has not received any correspondence from the FAA concerning his alleged failed training.

65. Notably, Mizelle, who had not recently taken a medical leave of absence and who was approximately ten (10) years younger than Plaintiff and approximately fifteen (15) years younger than Wolfe, suffered no retaliatory acts as far as Plaintiff is aware, even though he also expressed concern about Wolfe's cognitive abilities.

### FIRST COUNT
### Wrongful Termination –
### New Jersey Law Against Discrimination -*N.J.S.A.* 10:5-12, *et seq.*

66. Plaintiff repeats each of the foregoing allegations as if fully set forth at length herein.

67. Plaintiff's age and/or disability played a role and/or made a difference when Defendants ultimately terminated Plaintiff in violation of the New Jersey Law Against Discrimination, *N.J.S.A.* § 10:5-1, *et seq.*

68. Defendants' conduct was egregious and/or in reckless disregard of Plaintiff's legal rights under the New Jersey Law Against Discrimination.

69. The discriminatory and/or retaliatory conduct was performed by supervisors and members of upper management, and/or with their actual knowledge and willful indifference.

70. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to economic damages, loss of income, salary and benefits, as well as personal hardships, including but not limited to, harm to career, harm to reputation, humiliation, anxiety and emotional distress.

## SECOND COUNT
### Retaliation/Wrongful Termination
### - New Jersey Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1, *et seq.*

71. Plaintiff repeats and re-allege each of the foregoing allegations as if set forth at length herein.

72. Plaintiff engaged in protected conduct as set forth in the New Jersey Conscientious Employee Protection Act, *N.J.S.A.* §34:19-1, *et seq.* in that he objected to, threatened to disclose and/or refused to participate in conduct which he reasonably believed 1) was in violation of a law or regulation promulgated under law, and/or 2) was in violation of a clear mandate of public policy affecting the public health, safety, or welfare.

73. As a result of his protected conduct, Plaintiff suffered retaliation from Defendants including, without limitation, wrongful termination.

74. The retaliation was performed by upper management, and/or with their knowledge or willful indifference.

75. The retaliation was egregious and actuated by actual malice and/or was done with wanton and willful disregard of the rights of Plaintiff.

76. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to economic damages, loss of income, salary and benefits, as well as personal hardships, including but not limited to, harm to career, harm to reputation, humiliation, anxiety and emotional distress.

## THIRD COUNT
### (Retaliation –
### FMLA – 29 U.S.C. §2601, *et seq.*)

77. Plaintiff repeats each of the foregoing allegations as if fully set forth at length herein.

78. Defendants illegally retaliated against Plaintiff for his FMLA qualifying leave in violation of the FMLA.

79. As a direct and proximate result of the aforementioned conduct, Plaintiff has suffered and will continue to suffer damages, including but not limited to economic damages, loss of income, salary and benefits, as well as personal hardships, including but not limited to, harm to career, harm to reputation, humiliation, anxiety and emotional distress.

**WHEREFORE** Plaintiff James J. Mirena demands judgment against Defendants Executive Jet Management, Inc., NetJets, Inc., ABC Corporations (1-10), JANE DOES 1-10 AND JOHN DOES 1-10, for the following:

a. Compensatory damages;

b. Back pay

c. Front pay;

d. Consequential damages;

e. Liquidated/Punitive Damages;

f. Reasonable attorneys' fees with enhancement;

g. Costs of suit;

h. Pre-judgment and post-judgment interest; and

i. Such other relief as the Court may deem equitable and just.

**GREEN SAVITS, LLC**
*Attorneys for Plaintiff, James J. Mirena*

By: */s/ Laura M. LoGiudice*
Laura M. LoGiudice

Dated: May 19, 2021

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues subject to trial by jury.

                                           **GREEN SAVITS, LLC**
                                           *Attorneys for Plaintiff, James J. Mirena*

                                 By: */s/ Laura M. LoGiudice*
                                          Laura M. LoGiudice

Dated: May 19, 2021