UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JAMES J. MIRENA,

               *Plaintiff*,

     v.

EXECUTIVE JET MANAGEMENT, INC.,
et al.,

               *Defendants*.

No. 21-cv-11493 (MEF)(MAH)

**OPINION and ORDER**

**Table of Contents**

I.   **Background**

    A.  **The Evidence**

    B.  **The Lawsuit**

    C.  **The Motion**

    D.  **The Court's Approach**

II.  **Legal Principles**

    A.  **Summary Judgment**

    B.  **The Conscientious Employee Protection Act**

III. **Legal Theory One: The Pilot's Complaint**

    A.  **Causation**

        1.  **In General**

        2.  **At Work**

        3.  **In This Case: An Overview**

    B.  **The Intervening Event: The Failed Checkride**

    C.  **The Severity of the Intervening Event**

    D.  **The Timing of the Intervening Event**

        1.  **Timing in General**

      **2.**  **Timing in Absolute Terms**

      **3.**  **Timing Relative to What Was Done**

  **E.**  **A Tentative Conclusion**

  **F.**  **Stress Tests**

      **1.**  **Why**

      **2.**  **The Force of the Complaint**

          **a.**  **The Response to the Complaint**

          **b.**  **Timing**

      **3.**  **Separating Out the Events**

          **a.**  **Different in Kind**

          **b.**  **The Coworker**

          **c.**  **Relative Timing**

  **G.**  **Conclusion**

**IV.**  **Legal Theory Two: The Failed Checkride**

**V.**  **Conclusion**

*    *    *

A pilot was fired.

He sued, claiming he lost his job for blowing the whistle on a colleague who could not fly safely.

The pilot's old employer has now moved for summary judgment.

The motion is granted.

*    *    *

**I.**  **Background**

  **A.**  **The Evidence**

The evidence relevant for now is as follows.

A pilot (the "Pilot"[1]) worked for a private-jet company.  <u>See</u> Defendant's Statement of Material Facts ("Statement of Material Facts") ¶¶ 16–17; Response to Statement of Material Facts ¶¶ 16–17.  He flew as part of a crew.  <u>See</u> <u>id</u>. at ¶¶ 17–18; Statement of Material Facts ¶¶ 17–18.

---

[1]  James J. Mirena.

He came to believe his flight crew's lead pilot (the "Lead Pilot"[2]) was experiencing a serious cognitive decline.  See Deposition of James J. Mirena 141:6-23; Statement of Material Facts ¶ 17; Response to Statement of Material Facts ¶ 17.  And he concluded the Lead Pilot's decline "was endangering other crew members, the passengers, [and] the public."  Mirena Deposition 141:17-19.

At a meeting in April 2020, the Pilot essentially described this to a company leader, the chief pilot (the "Chief Pilot"[3]).  See id. at 163:20 to 166:6; 171:8-13; Statement of Material Facts ¶ 66; Response to Statement of Material Facts ¶ 2.

Around a month later, in May, the Pilot took part in a "checkride" --- a flying test run by the Federal Aviation Administration ("FAA").  See Statement of Material Facts ¶¶ 48, 51; Counter Statement of Material Facts ¶ 86.

The Pilot failed the checkride, see Statement of Material Facts ¶¶ 54-57, and was fired soon after.  See Mirena Deposition, Exhibit Mirena-18.

### B.  **The Lawsuit**

In light of the above, the Pilot sued his employer[4] under New Jersey's Conscientious Employee Protection Act ("CEPA").

From here, the Pilot is mainly called the "Plaintiff," and the employer is mainly called the "Defendant."

The Plaintiff's claim is based on two legal theories.

First, that he was illegally fired in retaliation for complaining about the Lead Pilot.  See Opposition to Motion for Summary Judgment at 1, 16.

---

[2]  James Wolfe.

[3]  Pete Djordjevic.

[4]  Executive Jet Management, Inc.  Other defendants were named, too: ten "ABC Corporation" defendants, plus ten "Jane Doe" defendants and ten "John Doe" defendants.  None of these has been identified by the Plaintiff or served.  They are not considered here.

And second, that he was illegally fired for failing the FAA checkride, because he failed in the name of safety, as explained below. See id. at 16.

### C.    **The Motion**

The Defendant has now moved for summary judgment.

The motion is before the Court.

### D.    **The Court's Approach**

After an overview of the governing legal principles as to summary judgment, see Part II.A, and CEPA, see Part II.B, the Court assesses the Pilot-Plaintiff's first legal theory, see Part III, and his second. See Part IV.

The Court's conclusion: summary judgment must be granted because a reasonable jury could not find for the Plaintiff on either theory. See Part V.

## II.   **Legal Principles**

### A.    **Summary Judgment**

A defendant's summary judgment motion is a "threshold inquiry," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986), the last main step before a trial.

Part of a court's job on a defendant's summary judgment motion is to look ahead to the possibility of trial and ask whether a reasonable jury could find for the plaintiff. If yes, a trial must be greenlighted. If no, there is no need for a trial --- and judgment can be entered for the defendant without one.

Per the Supreme Court: at summary judgment, "[t]he judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict --- 'whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" Anderson, 477 U.S. at 252 (quoting Schuylkill & Dauphin Imp. Co. v. Munson, 81 U.S. 442, 448 (1871) (cleaned up)).

Similarly: judges need not "submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character

that it would warrant the jury in finding a verdict in favor of that party."  Id. at 251 (quoting Munson, 81 U.S. at 448); see id. at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); accord, e.g., Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 298 (3d Cir. 2018) (reversing entry of summary judgment where plaintiff "adduced evidence to support th[e] allegations 'such that a reasonable jury could return a verdict' in his favor") (citation omitted); Hakeem v. Salaam, 260 F. App'x 432, 434 (3d Cir. 2008) (affirming entry of summary judgment where "there was an insufficient evidentiary basis on which a reasonable jury could find in [the plaintiff's] favor"); Angeloni v. Diocese of Scranton, 135 F. App'x 510, 512 (3d Cir. 2005) ("If the evidence would be insufficient to allow a reasonable jury to find for the non-moving party, summary judgment is warranted.").

In engaging in the analysis outlined above, there are hard-edged rules.  Courts must draw every inference in favor of the plaintiff.  See Anderson, 477 U.S. at 255.  They must work only from the undisputed evidence.  See id. at 248.  And they cannot assess credibility or weigh the evidence.  See id. at 255.

### B.    The Conscientious Employee Protection Act

As noted, the Plaintiff here has sued under CEPA.

The statute is designed "to protect and encourage employees to report illegal or unethical workplace activities and to discourage . . .  employers from engaging in such conduct." Dzwonar v. McDevitt, 177 N.J. 451, 461 (2003) (cleaned up).

To make out a CEPA claim, a plaintiff must demonstrate that:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Chiofalo v. State, 238 N.J. 527, 541 (2019).

*    *    *

As to the "causal connection" element, which looms large here, four points for now.

<u>First</u>, under New Jersey law causation is generally rooted in considerations of "common sense." Caputzal v. Lindsay Co., 48 N.J. 69, 77–78 (1966) (quoting Powers v. Standard Oil Co., 98 N.J.L. 730, 734 (Sup. Ct. 1923), aff'd, 98 N.J.L. 893 (1923)).

Second, causation is a "highly context-specific" inquiry. Levins v. Braccia, 2009 WL 1658610, at *6 (N.J. Super. Ct. App. Div. June 16, 2009) (quoting Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)). "[T]he proffered evidence" should be "looked at as a whole," Kachmar, 109 F.3d at 177, and "[u]ltimately, there are 'no limits' on what a court can consider in determining whether a causal connection exists between an employee's protected activity and his employer's adverse decision." Campbell v. Abercrombie & Fitch, Co., 2005 WL 1387645, at *8 (D.N.J. June 9, 2005).

Third, "[t]o demonstrate causation, a plaintiff must show that the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" Kerrigan v. Otsuka Am. Pharm., Inc., 706 F. App'x 769, 771 (3d Cir. 2017) (quoting Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 293 (App. Div. 2001)); see also Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 550 (App. Div. 1995) (holding that a "causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive").

And fourth, a chain running from cause to effect can be built up and locked into place --- but it can also be broken. A "causal connection may be severed by . . . some legitimate intervening event." Wiest v. Tyco Elecs. Corp., 812 F.3d 319, 330 (3d Cir. 2016) (cleaned up); accord Houston v. Dialysis Clinic, Inc., 2015 WL 3935104, at *11 (D.N.J. June 26, 2015).[5]

## III. Legal Theory One: The Pilot's Complaint

As noted, the Pilot-Plaintiff presses two legal theories as to how CEPA was violated. The first theory is taken up here in Part III, the second is the focus of Part IV.

*    *    *

---

[5] Not all of the cases cited in Part II.B are CEPA cases. But all are relevant here. See footnote 8.

The Plaintiff's first theory: the Defendant violated CEPA by firing him for the complaint he made about the Lead Pilot's asserted cognitive decline.  See Opposition to Motion for Summary Judgment at 2-3, 7.

The Defendant's counterargument: summary judgment must be granted because no "reasonable juror," see Part II.A, could conclude this complaint caused the Pilot's firing --- causation, as noted, being one of the elements of a CEPA claim.  See Motion for Summary Judgment at 4-6; see generally Part II.B (laying out CEPA elements).

The Defendant's counterargument is persuasive, for reasons introduced just below.

                         *     *     *

A CEPA plaintiff must show that a through-line runs from cause to effect --- here, that there is a "causal connection," Chiofalo, 238 N.J. at 541, linking (a) the Pilot-Plaintiff's April 2020 complaint about the Lead Pilot (the claimed cause) to (b) the employer-Defendant's May 2020 decision to fire him (the claimed effect).[6]

But there is no such "causal connection" here.

In this case, another link was wedged into the middle of the (a)/(b) chain --- and the Court concludes as a matter of law that it was this "intervening event," Wiest, 812 F.3d at 330, that caused the Defendant to fire the Pilot.

The "intervening event" was the Pilot's May 2020 failure of his FAA checkride.

The undisputed evidence establishes two things.  First, as noted, that the checkride failure caused the Pilot's firing. And second, that it broke any possible causal link that might arguably have otherwise run from the Pilot's earlier complaint about the Lead Pilot to the later decision to fire him.

Because he failed the FAA checkride, the Pilot was not allowed to fly.  He was legally barred from doing his job, at least at that point.  Later on the day of the checkride failure, the employer-Defendant began considering how to proceed.  A letter

---

[6]  The Court assumes for the purposes of this Opinion and Order that the Pilot's complaint about the Lead Pilot counts as protected "whistle-blowing" activity under CEPA.

dated nine days later told the Pilot he would be fired.  See Mirena Deposition, Exhibit Mirena-18.  Four days after that, he formally was.  See id.

It was, in short, the failed FAA checkride that caused the Pilot-Plaintiff's firing.  And the strength of that conclusion completely pushes aside the competing hypothesis the Plaintiff proposes --- that what happened before the checkride, when he complained about the Lead Pilot, was a "determinative factor" in his firing.  See Kerrigan, 706 F. App'x at 771.

Bottom line: the Court concludes that a reasonable jury could land on only one conclusion.  The "intervening event," the failed FAA checkride, caused the Pilot's firing.  And it snapped any possible causal chain that might arguably have stretched back further, to the Pilot's earlier complaint about the Lead Pilot.

                          *     *     *

The Court begins to unpack the above, piece by piece.

To do so, it first lays out three general, common-sense aspects of causation.  See Part III.A.

The Court then considers how each of these three aspects of causation applies to this case.  See Part III.B-D.  In a word: each suggests the failed FAA checkride, not the Pilot's earlier complaint, caused the Pilot to be fired.  See Part III.E.

Next, the Court explains that before this initial conclusion is finalized it needs to be stress-tested.  See Part III.F.  Accordingly, the Court circles back to determine whether its preliminary assessment holds up.  See Part III.G.

The Court's conclusion: it does.  See id.

                          *     *     *

In sum, the undisputed evidence, read with all inferences favoring the Pilot-Plaintiff, makes clear that he was fired because he failed the FAA checkride.  His earlier complaint did not play any role.  This means the employer-Defendant is entitled to summary judgment as to the Pilot's first legal theory.  That legal theory requires the Pilot to show he was fired, at least in part, because of his complaint about the Lead Pilot.  But no reasonable jury could reach that conclusion.

A.  __Causation__

The stepping-off point here is a look to causation: in general, see Part III.A.1; in the workplace, see Part III.A.2; and in this case, see Part III.A.3.

1.  __In General__

Causation is a "highly context-specific" inquiry.  Levins, 2009 WL 1658610, at *6 (cleaned up).  A broad range of evidence must generally be considered, see Campbell, 2005 WL 1387645, at *8, and considered "as a whole."  Kachmar, 109 F.3d at 177.

This can make it hard to analyze causation in a consistent way. Different factors may matter more or less in a particular case.

This said, pinning down a link between an asserted cause and an asserted effect is often a matter of zeroing in on three sorts of things.

To see these, take as an example a farmer whose fields were drowned in a flood.

*    *    *

Say the farmer sues a nearby dam operator, claiming the operator swung open the dam's floodgates, causing the flood.

The farmer's claim may well hang together --- because there is a common-sense link between the cause invoked by the farmer (the opening of the floodgates) and the effect (the flooding of her farm).

But the farmer's claim plainly will not work if her complaint blames the flood on a loud party at the dam site.  Loud parties can have effects --- they can, for example, interfere with a person's right to "quiet enjoyment" of her property.  But they do not cause floods.

Bottom line: common sense teaches that an asserted cause must have happened factually --- and it must also have a certain __quality__ to it, it must be the kind of thing that can cause a given effect.

And there is a __quantity__ aspect to causation, too.  A torrent of water can cause a field to flood.  But not a trickle.

And finally, there is a __timing__ aspect.  Opening the dam's floodgates two or three hours before the farm was submerged

9

might have caused the flood.  But the hypothesized causal chain
is more tenuous if the farmer's argument is that opening the
floodgates two or three years ago caused the flood.

### 2.   At Work

This cluster of three factors --- quality, quantity, and timing
--- can often help to clarify whether one thing caused another.

And that is true in a workplace context.  For example, if the
question is "was she fired because of not-good-enough work?" it
can be useful to tick through a quality/quantity/timing
analysis.

Take first the qualitative point.

Subpar workplace performance is, in the farm analogy, more like
an opened floodgate than a loud party.  It is the kind of thing
that can cause an employee to be fired.

Second, the quantitative point.

A workplace-performance issue can be more serious or less
serious --- in the farm analogy, like a torrent of water or like
a trickle.

And third, timing.

When a workplace event happens can shed light on causation.  The
shorter the lapse between (a) an asserted cause (like deficient
workplace performance) and (b) an asserted effect (like being
fired) --- the greater the odds that (a) caused (b).

### 3.   In This Case: An Overview

The Court analyzes this case with an eye on the factors set out
just above.

First, quality.

There is strong and undisputed evidence that the Plaintiff was
fired because of the failed FAA checkride.  See Part III.B.  And
a failed checkride is plainly the kind of thing that can get a
pilot fired.  This is because a pilot who fails a checkride is
legally prohibited from doing his job, see Statement of Material
Facts ¶¶ 5-9, Response to Statement of Material Facts ¶¶ 5-9,
and may not be able to do it safely.

Second, quantity --- how much?

The performance issue here, the failed FAA checkride, was serious.  Courts routinely conclude that workplace performance failures <u>less</u> serious than a failed checkride are enough to establish that the performance failure --- and not another, earlier event --- caused the employee to be fired.  <u>See</u> Part III.C.

And <u>third</u>, timing.

A relatively small number of days, nine, ran off the calendar from (a) the Pilot failing the checkride to (b) the Defendant's decision to fire him.  Courts often hold that a lapse of nine or so days supports the conclusion that it was the performance failure --- and not what happened before --- that caused the employee to be fired.  <u>See</u> Part III.D.

This adds up to the Court's conclusion: the Pilot was fired because of his failed FAA checkride, an "intervening event"; his earlier complaint about the Lead Pilot was not part of the causal mix.  It did not matter.  <u>See</u> Part III.E.

This conclusion, though, is at first only tentative.  Why, and how the Court firms things up --- these are the subjects of Part III.F and Part III.G.

      **B.**    <u>**The Intervening Event: The Failed Checkride**</u>

Start by considering the undisputed facts as to the Pilot's failed FAA checkride and what followed.

*     *     *

The FAA requires pilots to pass periodic checkrides.  <u>See</u> Statement of Material Facts ¶¶ 5-9; Response to Statement of Material Facts ¶¶ 5-9.

The FAA sets the criteria for passing these checkrides.  <u>See</u> Statement of Material Facts ¶ 10; Response to Statement of Material Facts ¶ 10.  And it empowers check pilots --- FAA agents who are said to take their duties "[e]xtremely seriously," Statement of Material Facts ¶ 11 (citation omitted); Response to Statement of Material Facts ¶ 11 --- to run checkrides on behalf of the agency.

The Pilot's checkride was part of his twice-a-year training.  <u>See</u> Statement of Material Facts ¶ 6; Response to Statement of Material Facts ¶ 6; <u>see also</u> 14 C.F.R. § 135.351(a).

11

The training had been scheduled in January 2020.  See Statement of Material Facts at ¶ 43; Response to Statement of Material Facts ¶ 43.  At that time, it was also decided that the Pilot would train with the Lead Pilot.  See id.; Statement of Material Facts ¶ 43.

All of this went ahead as planned starting on May 13, 2020.  See id. at ¶ 49; Response to Statement of Material Facts ¶ 49.

But the Pilot got off to a rocky start.  He failed a written test before going on to pass it.  See Statement of Material Facts ¶ 45; Response to Statement of Material Facts ¶ 45.  And during four days of simulated flight training, he showed several "weaknesses," in the judgment of an on-scene FAA official.  See Godzinski Declaration, Exhibit J (Exhibit 11), at 6; Statement of Material Facts ¶ 46; Response to Statement of Material Facts ¶ 46.

But no matter.  The Pilot advanced to the checkride the next day.  See id. at ¶ 48; Statement of Material Facts ¶ 48.  The checkride took place on a flight simulator, and the Pilot's checkride performance would now be evaluated by another on-scene FAA official ("the FAA Check Pilot"[7]).  See id. at ¶ 9; Response to Statement of Material Facts ¶ 9.

The FAA Check Pilot said he gave the Pilot "every opportunity to demonstrate proficiency."  Deposition of Gary Landrum 47:11.

But the checkride did not work out.  The Pilot failed to complete required safety briefings and checklists.  See id. at 68:19-21.  He did not lower the landing gear as the plane descended.  See id. at 68:22-23.  He did not configure the plane for its final approach, as he was supposed to.  See id. at 68:21-22.  He attempted to land instead of calling a missed approach.  See id. at 63:4 to 64:16.  And he repeatedly did not load the correct approaches onto a flight computer.  See id. at 43:19 to 46:12, 51:24 to 52:4, 69:7 to 71:20, 83:23-25.

The FAA Check Pilot concluded the Plaintiff's performance was not salvageable and stopped the checkride; he failed the Pilot.  See id. at 47:7-13, 84:24 to 85:1.

From there, the employer-Defendant began thinking through what to do.  See Declaration of Peter Djordjevic ¶ 6.  One of the employer's senior leaders spent a good deal of time during the

---

[7]  Gary Landrum.

next nine days consulting with others --- and the employer ultimately decided to fire the Pilot.

The events of those nine days are described below.  <u>See</u> Part III.D.

For now, note only that the evidence put before the Court shows that the <u>sole</u> focus of discussion during the nine days was on whether to fire the Pilot for his subpar showing at the May 2020 FAA training, including the failed FAA checkride.  No evidence has been flagged that anyone discussed the Pilot's earlier complaint about the Lead Pilot, or gave it any weight.

*    *    *

The undisputed facts described above strongly support the conclusion that the Pilot was fired only because he failed the FAA checkride in May 2020.

*    *    *

Was all this trumped up by the employer-Defendant?  Was it an effort to drop a stumbling block into the Pilot's path, to gin up an after-the-fact reason to fire him because of his earlier complaint about the Lead Pilot?

The Court's conclusion: no.

<u>First</u>, no evidence along these lines has been put before the Court.

<u>Second</u>, the FAA training was scheduled in January 2020, <u>see</u> Statement of Material Facts ¶ 43; Response to Statement of Material Facts ¶ 43 --- around three months <u>before</u> the Pilot said anything about the Lead Pilot.

<u>Third</u>, there is no indication that the employer was backstage pulling strings.  The Check Pilot was an FAA agent, <u>see</u> Statement of Material Facts ¶ 11, Response to Statement of Material Facts ¶ 11, and it was he who decided the Plaintiff failed the checkride.  <u>See</u> Statement of Material Facts ¶ 57; Response to Statement of Material Facts ¶ 57.  The employer-Defendant had no say in that conclusion or in the diagnostic steps that led up to it.  <u>See</u> <u>id</u>.; Statement of Material Facts ¶ 57.  And the employer-Defendant did not choose how the FAA Check Pilot administered the checkride, which skills he assessed, or which scenarios he tested using the flight

13

simulator.  <u>See</u> <u>id</u>.;  Response to Statement of Material Facts ¶ 57.

And <u>fourth</u>, there is no evidence here the Pilot was singled out. Quite the opposite.

The FAA Check Pilot administered the Pilot's May 19 checkride; the Pilot failed and was formally fired on June 1.  <u>See</u> Mirena Deposition, Exhibit Mirena-18.

The FAA Check Pilot also administered the Lead Pilot's May 19 checkride.  The Lead Pilot failed, too.  <u>See</u> Statement of Material Facts ¶ 74; Response to Statement of Material Facts ¶ 74.  And on June 1, the Lead Pilot was also fired.  <u>See</u> <u>id</u>.; Statement of Material Facts ¶ 74.

This strongly suggests that the employer-Defendant was treating like cases alike.  What may have seemed to set the Pilot apart, his earlier complaint, simply did not matter.  <u>See</u> <u>Duong</u> v. <u>Benihana Nat'l Corp.</u>, 2020 WL 5422800, at *4 (D.N.J. Sept. 10, 2020) (noting that that a fight was "clearly an intervening occurrence" where the employer fired both parties involved), <u>aff'd</u>, 2022 WL 1125392 (3d Cir. Apr. 15, 2022).

                    *    *    *

Bottom line: the undisputed evidence supports only one conclusion --- the Pilot was fired solely for failing the FAA checkride.

                    *    *    *

And there can be no suggestion this was illogical.  Failing a checkride is plainly the <u>kind</u> of thing that can lead to a pilot being fired.

This is because a pilot who fails a checkride is then legally barred from flying.  <u>See</u> Statement of Material Facts ¶¶ 5-9; Response to Statement of Material Facts ¶¶ 5-9.  And when a person is prohibited from doing his job, that is the sort of thing that may cause an employer to act.  No surprise if a law firm fires a lawyer after he is disbarred, or if a trucker is let go if she loses her commercial driver's license.

### C. __The Severity of the Intervening Event__

There is, per the preceding section, strong and undisputed evidence that the Pilot's failed FAA checkride caused his firing.

Was the failed checkride "of sufficient severity to break any causal nexus between [the Pilot's] participation in a protected activity" --- his earlier complaint --- "and [the] adverse employment action," his being fired? Wright v. Providence Care Ctr., LLC, 822 F. App'x 85, 95 (3d Cir. 2020).[8]

The Court's answer: yes.

To see why, look to cases like this one, in which an employee engaged in protected conduct[9] at Time 1 and was fired at Time 3. In those cases, courts have routinely held that any possible Time-1-to-Time-3 causal chain is snapped as a matter of law by subpar performance at Time 2.

What sort of subpar performance?

A police officer's obstruction of an investigation and her failure of a fitness-for-duty evaluation. See Mader v. Edison Twp. (Police Dep't), 2023 WL 2125399, at *1, *3 (N.J. Super. Ct. App. Div. Feb. 21, 2023). FedEx employees' threatening Facebook posts. See Shinn v. FedEx Freight, Inc., 2018 WL 4275993, at *7

---

[8] Note that Wright is not a CEPA case. Rather, it arose under the Americans with Disabilities Act and the Family and Medical Leave Act. But CEPA is part of the broader fabric of employment law. And in interpreting the statute, New Jersey courts routinely look to other corners of employment law. See, e.g., Winters v. N. Hudson Reg'l Fire & Rescue, 212 N.J. 67, 90 (2012); Feldman v. Hunterdon Radiological Assocs., 187 N.J. 228, 246-47 (2006). Federal courts interpreting CEPA do the same thing. See, e.g., Fraternal Ord. of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 242 (3d Cir. 2016); Levins, 2009 WL 1658610, at *7; Campbell, 2005 WL 1387645, at *11; Bowles v. City of Camden, 993 F. Supp. 255, 261 (D.N.J. 1998). And the parties here cite numerous non-CEPA employment-law cases to advance their arguments as to how CEPA should be interpreted. See, e.g., Motion for Summary Judgment at 4 (citing Brewer v. Quaker State Oil Refin. Corp., 72 F.3d 326 (3d Cir. 1995), an Age Discrimination in Employment Act case); Opposition to Motion for Summary Judgment at 29 (citing Title VII cases).

[9] See footnote 6.

(D.N.J. Sept. 7, 2018), <u>aff'd</u>, 783 F. App'x 229 (3d Cir. 2019). A nurse disobeying her manager and being short with a patient. <u>See</u> <u>Tinio</u> v. <u>Saint Joseph Reg'l Med. Ctr.</u>, 2015 WL 1530912, at *1, *8-9 (D.N.J. Apr. 6, 2015), <u>aff'd</u>, 645 F. App'x 173 (3d Cir. 2016). Another nurse missing a day of work without calling in. <u>See</u> <u>Houston</u>, 2015 WL 3935104, at *11. A railway worker leaving a large machine unattended. <u>See</u> <u>Joseph</u> v. <u>N.J. Transit Rail Operations, Inc.</u>, 2013 WL 5676690, at *11 (D.N.J. Oct. 17, 2013), <u>aff'd</u>, 586 F. App'x 890 (3d Cir. 2014). An insurance director distributing a memo that amounted to "provocative insubordination and publicly confrontational conduct . . . toward her supervisor." <u>See</u> <u>Reap</u> v. <u>Cont'l Cas. Co.</u>, 2002 WL 1498679, at *21 (D.N.J. June 28, 2002). A flight attendant's verbal abuse of a coworker and other errors during probationary training. <u>See</u> <u>Hankins</u> v. <u>AirTran Airways, Inc.</u>, 237 F. App'x 513, 523 (11th Cir. 2007). A crew supervisor's abandonment of a job site. <u>See</u> <u>Weiler</u> v. <u>R&T Mech., Inc.</u>, 255 F. App'x 665, 668-69 (3d Cir. 2007).

These cases all involved conduct that was in roughly the same range of "sever[ity]," <u>Wright</u>, 822 F. App'x at 95, as the Pilot failing the FAA checkride.

If missing work, <u>see</u> <u>Houston</u>, 2015 WL 3935104, at *11, or abandoning a machine, <u>see</u> <u>Joseph</u>, 2013 WL 5676690, at *11, is "severe" enough to amount to an "intervening event" as a matter of law --- then the Pilot failing an FAA checkride surely is, too. The former suggests the employee may not be doing a good job. The latter means the employee cannot do his job at all --- that he is barred from doing the work he is paid for. <u>See</u> Statement of Material Facts ¶¶ 5-9; Response to Statement of Material Facts ¶¶ 5-9.

To see the "sever[ity]" of the failed FAA checkride in sharper relief, zoom in now on three CEPA cases.

                    *    *    *

<u>Harris</u> v. <u>Clean Harbors Environmental Services, Inc.</u>, 2019 WL 5446299 (D.N.J. Oct. 24, 2019), is the starting point.

There, the plaintiff, a driver named Jaron Harris, complained about a company policy. <u>See</u> <u>id</u>. at *6, *14. About a month later, Harris slept through a call from a supervisor, missed work, and was fired. <u>See</u> <u>id</u>. at *1, *5, *14.

The court held that the missed call "standing alone is sufficient to rule that [the] [p]laintiff did not establish the causation element of the prima facie case." Id. at *14 (emphasis added). In light of this, the court granted summary judgment for the defendants. See id. at *1.

The intervening event that led to Harris's termination was less "severe," Wright, 822 F. App'x at 95, than the Pilot's FAA checkride failure. Harris's failure did not bar him from doing his job. He might even have been able to return to work the same day: despite oversleeping, he said that he could have arrived on site before his replacements. See Harris, 2019 WL 5446299, at *5. By contrast, the Pilot here could not legally return to work, at least not right away.

\*    \*    \*

A second example: Campbell v. Abercrombie & Fitch, Co., 2005 WL 1387645 (D.N.J. June 9, 2005), another CEPA case.

Jeffrey Campbell, a security supervisor, reported racial discrimination to his employer. See id. at *1-2. To prove it, he investigated one of his employer's stores without permission to do so. See id. at *2.

The court held that the unauthorized investigation cut any possible causal cord that might otherwise have linked the plaintiff's earlier report to his later termination. See id. at *9; see also id. at *11. It granted summary judgment for the employer-defendant. See id.

The intervening event in Campbell took place "on a personal day," see id. at *2, and did not disable the plaintiff from doing his job. The intervening event here was severe --- it (a) barred the Plaintiff from doing his job and (b) suggested he could not do it safely.

\*    \*    \*

For a last example, take Dass v. National Retail Transportation, Inc., 2005 WL 3108212 (N.J. Super. Ct. App. Div. Nov. 22, 2005).

Tulsie Dass, a mechanic, made a complaint --- and then had a heated argument with his boss about fixing a truck. See id. at *1-3. Per the court, Dass's insubordination counted as an intervening event. It prevented him from "establish[ing], either directly or by reasonable inference, that there was a causal connection between his protected activity and his

termination." Id. at *4.  The trial court therefore granted summary judgment for the defendant, and that was affirmed.  See id. at *1.

This, too, was likely less "severe," see Wright, 822 F. App'x at 95, than the Pilot's failed FAA checkride.  Dass could potentially have returned to work the next day in a different frame of mind.  Time could have passed.  Tempers could have cooled.

But the Pilot here could not have returned to the cockpit right away.  He was legally forbidden from doing so.  See Statement of Material Facts ¶¶ 5-9; Response to Statement of Material Facts ¶¶ 5-9; see also 14 C.F.R. § 135.297.  And unlike Dass's insubordination, the Plaintiff's failure of the checkride raised questions about his ability to do his job without endangering lives.

### D.    **The Timing of the Intervening Event**

As set out above, see Part III.C, the severity of the Pilot's workplace-performance issue (the failed FAA checkride) favors the conclusion that it was an "intervening event" --- one that broke any causal chain that otherwise might arguably have yoked what happened before (the Pilot complaining) to what happened after (the Pilot being fired).

Something else favors this conclusion, too: the timing of the relevant events.  This point is unpacked below.

### 1.    **Timing in General**

In retaliation cases like this one, timing matters as a matter of "logic" and "common sense."  See Caputzal, 48 N.J. at 77-78; see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 70 (2006); Fraternal Ord. of Police, Lodge 1, 842 F.3d at 243 n.49; Lemaster v. Lawrence Cnty., Ky., 65 F.4th 302, 310 (6th Cir. 2023); Picarella v. HSBC Sec. (USA) Inc., 724 F. App'x 22, 24 (2d Cir. 2018); Conroy v. Vilsack, 707 F.3d 1163, 1182 (10th Cir. 2013); Aristyld v. City of Lauderhill, 543 F. App'x 905, 908 (11th Cir. 2013); Trainor v. HEI Hosp., LLC, 699 F.3d 19, 27 (1st Cir. 2012).

Closeness-in-time between asserted cause and asserted effect supports an inference of causation, and remoteness-in-time detracts from it.[10]

If a person violates a workplace rule (cause) and is quickly punished (effect), that suggests the rule violation motivated the punishment --- and therefore, what happened earlier did not matter.

On the flip side, a too-long time lag from violation to punishment raises questions. If the violation caused the punishment, what took so long? Was it really the violation that was doing the work?

---

[10] This point comes up in a variety of contexts. See, e.g., Qin v. Vertex, Inc., 100 F.4th 458, 476 (3d Cir. 2024) ("Temporal proximity between the protected activity and the termination can be itself sufficient to establish a causal link.") (cleaned up); Newton-Haskoor v. Coface N. Am., 524 F. App'x 808, 811 (3d Cir. 2013) ("A causal connection may be established by showing 'an unusually suggestive temporal proximity' between the protected conduct and the adverse action."); Martone v. Jet Aviation Flight Servs. Inc., 2020 WL 3969919, at *4 (D.N.J. July 13, 2020) ("[C]ourts often look to chronological proximity.") (citing Abramson v. William Paterson Coll., 260 F.3d 265, 288 (3d. Cir. 2001)); Bocobo v. Radiology Consultants of S. Jersey, P.A., 477 F. App'x 890, 900 (3d Cir. 2012) ("The temporal proximity of a CEPA plaintiff's termination to his alleged whistle-blowing is important circumstantial evidence of the employer's motivation . . . ."); Maimone v. City of Atl. City, 188 N.J. 221, 237 (2006) ("The temporal proximity of employee conduct protected by CEPA and an adverse employment action is one circumstance that may support an inference of a causal connection.") (citing Romano, 284 N.J. Super. at 550); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) ("The amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation."); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) ("We have recognized, to be sure, that a suggestive temporal proximity between the protected activity and the alleged retaliatory action can be probative of causation.").

## 2. **Timing in Absolute Terms**

Here, nine days ran from the Pilot's failed FAA checkride to the employer-Defendant's decision to fire him.

And courts routinely conclude that when roughly nine days runs from an intervening event to a complained-of effect, there is a break as a matter of law in any causal chain that might otherwise have linked an arguable earlier cause to the end-of-the-line effect. See, e.g., Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822, 828 (1st Cir. 1991) (affirming grant of summary judgment, in part because nine days passed from an intervening event to the plaintiff's termination); Moore v. Philips Elecs. N. Am. Corp., 651 F. App'x 800, 801, 803 (10th Cir. 2016) (same); Yphantides v. Cnty. of San Diego, 660 F. Supp. 3d 935, 960 (S.D. Cal. 2023) (same, but 12 days); Aman v. Dillon Cos., 645 F. App'x 719, 722, 727-28 (10th Cir. 2016) (same, but 14 days); Hankins, 237 F. App'x at 520-21 (same, but 15 days); Dortch v. N.Y.C. Dep't of Educ., 2016 WL 2621076, at *1, *3, *8 (E.D.N.Y. Mar. 23, 2016) (same, but 18 days); Placide-Eugene v. Visiting Nurse Serv. of N.Y., 86 F. Supp. 3d 132, 144, 149-50 (E.D.N.Y. 2015) (same, but 33 days); cf. Freeman v. Ace Tel. Ass'n., 467 F.3d 695, 697-99 (8th Cir. 2006) (affirming grant of summary judgment because seven days lapsed from an intervening event to the plaintiff's termination); Twigg v. Hawker Beechcraft Corp., 2010 WL 11526771, at *3, *7 (D. Kan. Apr. 21, 2010) (same, but five days), aff'd, 659 F.3d 987 (10th Cir. 2011); Twymon v. Wells Fargo & Co., 403 F. Supp. 2d 921, 933-34 (S.D. Iowa 2005) (same, but four to five days), aff'd, 462 F.3d 925, 950 (8th Cir. 2006); Davis v. Time Warner Cable of Se. Wis., L.P., 651 F.3d 664, 674 (7th Cir. 2011) (same, but between three and 14 days); Cole v. Fam. Dollar Stores of Md., Inc., 2018 WL 3818811, at *1-2, *6 (D. Md. Aug. 10, 2018) (same, but three days), aff'd, 811 F. App'x 168 (4th Cir. 2020); Rumsey v. Ne. Health, Inc., 89 F. Supp. 3d 316, 336 (N.D.N.Y. 2015) (same, but two days), aff'd, 634 F. App'x 318 (2d Cir. 2016), as corrected (Jan. 29, 2016).[11]

---

[11] The cited cases are employment cases, but not CEPA cases. On the relevance of such cases, see footnote 8.

### 3.    Timing Relative to What Was Done

To be sure, all of this is "highly context-specific."  Levins, 2009 WL 1658610, at *6.

And sometimes, even a nine-day lapse may seem long --- so long that it whittles away at the strength of the inference that a causal chain runs from one event to another.[12]

But not here.

The reason: the nine days here was not dead time.  The employer-Defendant actively used the time to consider what to do about the failed checkride.  As such, the nine days work as a bridge, further bolting together the failed FAA checkride and the decision to fire the Pilot.

To see this, look now to some more of the undisputed facts.

*    *    *

On May 19, the same day the Plaintiff failed his checkride, the Chief Pilot learned what had happened.  See Djordjevic Declaration ¶ 6.  As he thought through next steps, the Chief Pilot considered the FAA's determination.  See id. at ¶ 8.  He found "no reason to doubt" it.  Id.

And the Chief Pilot began to take broad soundings, seeking perspective and advice.

He spoke to a colleague[13] who had observed parts of the Pilot's training.[14]  See Statement of Material Facts ¶ 40; Response to Statement of Material Facts ¶ 40.  This colleague emphasized the Pilot's poor attitude and refusal to accept responsibility for the checkride failure.  See Deposition of Pete Djordjevic 92:3-18, 96:7-16.  He recommended that the Pilot be fired.  See id. at 93:23 to 94:5.

---

[12] For example, dangerous workplace behavior might be expected to make an employer move on a faster timeline than nine days, to physically protect others.  But there is nothing like that here.

[13]  Ray Sauter.

[14]  Recall that the Pilot had recurrent training, which culminated in the FAA-administered checkride.

Two days after the checkride, this colleague sent an email to HR[15] in which he described the Pilot's checkride performance. See Mirena Deposition, Exhibit 13, at 2; Djordjevic Deposition 90:12-13. The Pilot "was jumbled and mixed" in his knowledge, repeatedly answered questions incorrectly, and blamed the Lead Pilot for his errors. See Motion for Summary Judgment, Exhibit 13, at 1. Per the email, the Pilot did not show "the knowledge level expected of a [pilot-in-command], let alone one who has been flying the airplane for three years." Id.

The Chief Pilot also consulted a second colleague[16] who had observed the Pilot's training. See Statement of Material Facts ¶ 40; Response to Statement of Material Facts ¶ 40. This colleague said the Pilot's checkride "performance was dismal" and that he "had exhibited a poor performance and attitude throughout the entire recurrent training." See Djordjevic Declaration ¶ 9. Moreover, the Pilot made many errors and was unable to work with the Lead Pilot "as a true crew." See Djordjevic Deposition 55:3-14.

Three days after the checkride, this colleague, too, emailed HR. See Motion for Summary Judgment, Exhibit 14, at 2. He wrote that the Pilot would "confuse" his "information . . . with other information." See id. And he said the Pilot did not do his missed-approach call-outs in the correct order and seemed to lack situational awareness. See id.

In addition, the Chief Pilot sat down with the employer's director of operations,[17] "a highly skilled" Air Force veteran, to talk about the FAA checkride and what to do about it. See Djordjevic Deposition 81:7-25. From the director: the Pilot's performance was "inexcusable" and merited termination. See id. at 94:6-12.

And the Chief Pilot went to outsiders, too. He turned to an old boss,[18] an experienced pilot. See Djordjevic Deposition 82:1 to 83:19. The old boss said he had never heard of anyone failing the written FAA exam the Pilot had, before going on to pass. See id. at 83:2-4; Part III.B.

---

[15]   Through Sherrie Hossman.

[16]   Chris Meadows.

[17]   Steve Jackson.

[18]   Dan O'Neal.

The Chief Pilot spoke at least twice with the Pilot, too.  <u>See</u> Djordjevic Declaration ¶ 11.  Both times, the Pilot refused to accept blame for his failed FAA checkride and faulted the Lead Pilot he was tested with.  <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> Statement of Material Facts ¶ 70; Response to Statement of Material Facts ¶ 53.

Bottom line: the employer collected information and advice over the course of nine days.  That work plainly mattered, undergirding the ultimate decision --- that the Pilot's "poor performance and attitude throughout the training, [and] his demonstrated lack of preparation for the training," meant that the Chief Pilot "no longer trusted [the Plaintiff] to safely operate the . . . aircraft."  <u>See</u> Djordjevic Declaration ¶ 14.[19]

*    *    *

Given all that was packed into it, the nine-day lag between the failed FAA checkride and the Pilot's termination was relatively short --- and certainly short enough to strengthen the inference that the two events were related to each other as cause and effect.

The case law cited above, <u>see</u> Part III.D.2, makes that clear.

And other case law on causation supports this point, too.  When an employer acts at its first available opportunity after an event, that firms up the inference of a causal connection between the event and the action.

As the Third Circuit has put it, courts generally should consider "whether an adverse employment action took place as early as it could have[.]"  <u>Qin</u>, 100 F.4th at 476 (citing <u>Connelly</u> v. <u>Lane Const. Corp.</u>, 809 F.3d 780, 792-93 (3d Cir. 2016)); <u>accord</u>, <u>e.g.</u>, <u>Martone</u>, 2020 WL 3969919, at *4; <u>Lipschultz</u> v. <u>Holy Fam. Univ.</u>, 2017 WL 1331731, at *9 (E.D. Pa. Feb. 17, 2017); <u>Summa</u> v. <u>Hofstra Univ.</u>, 708 F.3d 115, 128 (2d Cir. 2013); <u>Bucalo</u> v. <u>Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 131 (2d Cir. 2012).

Here, that was the case.  The Pilot failed the checkride, and it took nine days to decide to fire him.  Given the broad

---

[19]  The letter terminating the Plaintiff struck a similar note: "An essential function of your position is to attend and pass recurrent training, which you did not successfully pass on May 19th, 2020."  Mirena Deposition, Exhibit Mirena-18.

consultation undertaken before the Pilot was fired --- nine days was plenty "early." <u>Qin</u>, 100 F.4th at 476.  The employer-Defendant did not sit on its hands, and neither did its senior leaders.  Accordingly, the nine-day lag supports an inference of causal connection between the intervening event and the decision to fire the Pilot.

###    E.    A Tentative Conclusion

Where things stand:

The Court has analyzed the relevant events here against the backdrop of three common-sense causation principles.  <u>See generally</u> Part III.A.

<u>First</u>, there is strong and undisputed evidence that the Plaintiff was fired because he failed the FAA checkride, and failing a checkride is indeed the sort of thing that could cause an employer to fire a pilot-employee.  <u>See</u> Part III.B.

<u>Second</u>, a "severe" intervening event can snap a causal chain as a matter of law --- rupturing any arguable link from an earlier event to the last-in-time event.  A look to the case law shows that the intervening event here, the failed FAA checkride, was severe enough to break any asserted connection between the Pilot's complaint about the Lead Pilot and his firing.  <u>See</u> Part III.C.

<u>Third</u>, when an intervening event is soon followed by an adverse action, that suggests the intervening event, and not something from before, caused the employer's act.  Here, the time between the failed FAA checkride and the firing decision was short and productive.  This supports the conclusion that the checkride failure, and not the earlier complaint, caused the Pilot's firing.  <u>See</u> Part III.D.

All of this adds up: the Court concludes that a reasonable jury could find only one thing on the undisputed facts here --- the Pilot was fired only because of the failed checkride, not because of his earlier complaint.

###    F.    Stress Tests

For now, the conclusion set out just above must be only tentative.

To stick, it must first be stress-tested, to ensure the Pilot's earlier complaint about the Lead Pilot did not somehow poke through the impact of the intervening event, and help to "determin[e]," Kerrigan, 706 F. App'x at 771, the later decision to fire him.

The Court explains the two main reasons why a confirmatory stress test is needed, see Part III.F.1 --- and then undertakes two distinct sorts of stress tests, one for each of the two reasons. See Part III.F.2-3.

### 1.    Why

The law of causation in this area is rooted in common sense. See Part III.D.1.

But common sense teaches that an intervening-event analysis that ticks through all the boxes can sometimes land on the wrong conclusion.

*       *       *

To see how, imagine a law firm whose policy is that lawyers must promptly fill out time sheets on pain of discipline.

And imagine a lawyer at the firm who is docked pay at Time 3. The day before, at Time 2, she failed to complete her time sheets.

A look at the basic intervening-event factors (severity, closeness-in-time, etc.) suggests that what happened at Time 2 caused what happened at Time 3 --- and whatever may have happened at Time 1 can therefore be ignored.

But that will not always be the right conclusion.

For example, if at Time 1 the lawyer committed a very serious ethical violation, she might have been headed for docked pay anyway, with or without a billing problem at Time 2.  In that circumstance, what happened at Time 2 may seem like it bore on what happened at Time 3 --- but really it did not.

And a second example.

If at Time 1, the lawyer handled her time sheets improperly --- why was she docked pay at Time 3?  Was it because she made a time-sheets error at Time 2?  Or was it because of the combined impact of the two time-sheets errors, at Time 1 and Time 2?

                        *    *    *

The two law-firm examples speak to a broader point.

An intervening-event analysis, of the kind conducted at Part
III.B-D, will typically clarify whether a Time 2 event caused a
Time 3 event.

But not always.

First, if the Time 1 event was especially telling --- if it
amounted to an unusually powerful driving force, like the
serious ethical violation in the law-firm example --- there is a
heightened possibility that the Time 3 event might have been
coming anyway.  The intervening event at Time 2 may look like it
was critical.  But the earlier event at Time 1 was the one that
did the real causal work and pushed things forward.

And second, if the Time 1 and Time 2 events blend together in
some way --- like the two time-sheet errors in the law-firm
example --- teasing apart their impact can sometimes be tricky.
That can make it especially hard to say whether the intervening
event mattered on its own --- or mattered only because it piggy-
backed on the earlier event.

                        *    *    *

After the Court reaches a preliminary conclusion, it will often
make sense to double back to address these two possibilities ---
to kick the tires to ensure that nothing is missed that, on the
facts of a particular case, should be considered in the
intervening-event analysis.  See generally Levins, 2009 WL
1658610, at *6; see also Campbell, 2005 WL 1387645, at *8.

The Court undertakes that analysis just below, in two parts.

                **2.    The Force of the Complaint**

As noted just above, one reason to stress-test the Court's
preliminary conclusion is the chance that the event at Time 1
(the Pilot's complaint) was so forceful that it determined the
Time 3 effect (his being fired).  On this possibility, the train
was barreling forward from Time 1 --- and what happened at Time
2 (the failed FAA checkride) was just-passing-through, a way
station that had no impact on the final destination.

Is this possibility in play here?

The Court's answer: no, for the reasons sketched out below.

### a.    The Response to the Complaint

First and most basically: there is no evidence the Pilot's complaint generated an especially forceful response.

There is, for example, no proof that a plan was hatched in the wake of the complaint to fire the Pilot.  And there is no suggestion of milder (though sometimes-telling) indicators.  No evidence that the Pilot was reproached for making the complaint.  Or that he was frozen out of important meetings, or treated with hostility or annoyance or even impatience.

Indeed, the Pilot's complaint did not seem to have triggered much of anything.

And it certainly did not trigger anything approaching the sort of employer "animus" that is typically associated with a successful CEPA claim[20] --- and which, in some circumstances, might be so pointed that it makes the employee's eventual firing a foregone conclusion, regardless of what else may happen.

\*    \*    \*

To see this no-"animus" point, look to an example, Fischer v. G4S Secure Solutions USA, Inc., 2014 WL 2887803 (D.N.J. June 25, 2014), aff'd, 614 F. App'x 87 (3d Cir. 2015).

Bryan Fischer, a nuclear-plant guard, raised safety concerns.  See id. at \*1.  He was later fired and sued his employer under CEPA.  See id. at \*6.  The district court found that Fisher

---

[20]  To prevail in a CEPA claim, a plaintiff must generally produce "direct or circumstantial evidence from which reasonable jurors could conclude that his termination was motivated in whole or in part by retaliatory animus due to his complaints."  Dass, 2005 WL 3108212, at \*4.  That evidence could be "any example of antagonism or retaliatory animus" occurring between the protected activity and termination.  Levins, 2009 WL 1658610, at \*7; see Kelly v. Simpson, 2018 WL 6314644, at \*8 (N.J. Super. Ct. App. Div. Dec. 4, 2018) (citing Schlichtig v. Inacom Corp., 271 F. Supp. 2d 597, 612-13 (D.N.J. 2003)); cf. Jacobs v. Cnty. of Bucks, 2023 WL 4418217, at \*4 (3d Cir. July 10, 2023).  A "plaintiff must put forth evidence such as a constant barrage of written and verbal warnings and disciplinary actions soon after plaintiff's initial complaints.'"  Prioli v. Cnty. of Ocean, 2021 WL 4473159, at \*10 (D.N.J. Sept. 30, 2021) (cleaned up).

"fail[ed] to establish causation" and granted summary judgment for his employer.  See id. at *20.

Why no causation?  In part because Fisher did not "show that [the] [d]efendant . . . exhibited animus toward" him based on the safety concerns he brought up.  See id. at *18.  To the contrary, the defendant was "very supportive of [the plaintiff's] disclosures."  Fischer, 614 F. App'x at 93.  It investigated his allegations and solicited his suggestions.  See Fischer, 2014 WL 2887803, at *18.

So too here.

At his deposition, the Pilot said the Chief Pilot (who heard out his complaint about the Lead Pilot) was not "acrimonious" or "angry."  Reply Brief, Exhibit A (Mirena Deposition) 179:18 to 180:1.  And the Pilot's comments seem to have been taken seriously.  After they were made, the employer-Defendant sent someone to observe the Lead Pilot at the previously scheduled training.  See Statement of Material Facts ¶ 41; Response to Statement of Material Facts ¶ 41.

In brief: the response to the Pilot's complaint was not hostile. This weakens any possible argument that the complaint loosed a powerful tide --- the sort that might potentially be expected to run until the Pilot was fired, regardless of any in-between event, like the failed FAA checkride.

                    *    *    *

Another piece of evidence backs up this conclusion, too.

The Pilot was not the only one who suggested the Lead Pilot's performance was flagging.  A third member of the flight crew (the "Crewmember"[21]) said the same thing, both before the Pilot did, see Deposition of Thomas Mizelle 20:7 to 25:9, 33:18 to 34:18; Djordjevic Deposition 17:6 to 21:6, and then again at the same time.  See id. at 32:1 to 34:16.[22]

---

[21]  Thomas Mizelle.

[22]  The Crewmember raised his concerns about the Lead Pilot more forcefully than the Pilot did --- on a greater number of occasions, and also more vocally.  See Statement of Facts ¶¶ 26-28, 36; Response to Statement of Facts ¶¶ 26-28, 36; Counter Statement of Material Facts ¶¶ 16-17, 19; Motion for Summary Judgment at 2, 12; Reply Brief at 8.  Indeed, at a meeting about the Lead Pilot, the Pilot was at the far end of the room,

But the Crewmember was not fired or punished; indeed, he was later promoted.  See Statement of Material Facts ¶ 75; Response to Statement of Material Facts ¶ 75.

As the Third Circuit has observed: that a "colleague[] . . . who [was] as involved, or more involved, in the same activity did not receive any negative treatment . . . negate[s] any possible inference of causation."  Wiest, 812 F.3d at 332.

The Seventh Circuit made a similar point in Holloway v. Soo Line Railroad Co., 916 F.3d 641, 645 (7th Cir. 2019).

There, two railway workers were involved in an accident.  See 916 F.3d at 643.  Afterwards, both reported an injury to their employer.  See id. at 644.  One worker was not disciplined.  See id. at 645.  The other, who had a history of disciplinary issues, was fired.  See id. at 643.

The Seventh Circuit noted that this comparison "only reinforces that the company did not retaliate against [the plaintiff] for his engaging in protected activity, but rather fired him because of his long record of disciplinary problems."  Id. at 645.[23]

Here, the Pilot and the Crewmember both raised concerns about the Lead Pilot.  One was fired.  The other was promoted.  Per Wiest and Holloway, this undermines any suggestion the Pilot's complaint drove things to his termination.  After all, the Crewmember made the same complaint --- but he kept his job.

                            *    *    *

In sum: there is no evidence that the Pilot's complaint about the Lead Pilot kicked off an especially forceful response --- of the kind that can sometimes set in motion a particularly powerful causal chain.  The response to the Pilot's complaint

---

"pretty silent," and saying only "a few words."  Djordjevic Deposition 32:18 to 33:6.  The Crewmember was the one "doing all the talking."  Id. at 33:1-2.  In his legal briefs, the Pilot says that he, unlike the Crewmember, pushed back when the Chief Pilot said that the Lead Pilot just needed more training.  See Opposition to Motion for Summary Judgment at 26.  But the Pilot cites no evidence for this.

[23]  Though not CEPA cases, the Third and Seventh Circuit cases shed light here.  See footnote 8.  So too does a Ninth Circuit case that is to similar effect.  See Schiff v. City & Cnty. of San Francisco, 528 F. App'x 758, 759 (9th Cir. 2013).

was not marked by "animus."  And the experience of the Crewmember shows that complaints about the Lead Pilot did not invariably lead to firing.

### b.    Timing

As noted just above, there is no proof that the Pilot's complaint about the Lead Pilot unleashed a great deal of energy that pushed hard in the direction of termination.

And any energy the Pilot's complaint did spin off would have petered out by the time the decision to fire him was made.  That is the import here of a set of Third Circuit cases.

Before getting to these, note that the gap between the Pilot's complaint about the Lead Pilot and the decision to fire him was 43 days.  See Mirena Deposition 171:8 to 172:22; Mirena Deposition, Exhibit Mirena-18.

With that number in mind, look to the cases.

In Jacobs v. County of Bucks, 2023 WL 4418217 (3d Cir. July 10, 2023), the Third Circuit held that a "gap of forty-two days, or six weeks," between (a) the complaint and (b) an adverse employment decision, with an intervening event lodged in between, "does not raise an inference of causation."  Id. at *4.

And in Thomas v. Town of Hammonton, 351 F.3d 108 (3d Cir. 2003), the Court of Appeals went further, holding that "the chronology of events does not provide substantial support" for a retaliation claim, when around 21 days ran from (a) the complaint to (b) an adverse action --- again with an intervening event lodged in between.  Id. at 114.

Other cases are to similar effect.  See, e.g., Marley v. Donahue, 2017 WL 2106125, at *6 (D.N.J. May 12, 2017) (42 days), aff'd sub nom. Marley v. Postmaster Gen. of United States, 747 F. App'x 901 (3d Cir. 2018); Choy v. Comcast Cable Commc'ns, LLC, 629 F. App'x 362, 365 (3d Cir. 2015) (six weeks); Martone, 2020 WL 3969919, at *4–5 (ten days).

In short: Third Circuit case law makes clear that any response to the earlier event (the Pilot's complaint) must be treated as having burned itself out over the course of the 43 days between the complaint and the Pilot's firing.

*    *    *

Put all of this together now.

The Court's preliminary conclusion was that the FAA checkride was an "intervening event." See Part III.E. But that conclusion needed to be stress-tested for possible indications that the earlier event was an unusually telling one --- that it generated especially powerful causal forces, of a sort that could have driven events to their conclusion and made a later "intervening event" superfluous. See Part III.F.2.

But none of that is in play here.

There is no evidence that the earlier event, the complaint about the Lead Pilot, triggered any especially meaningful response from the employer-Defendant --- let alone one that could impact events 43 days later.

Therefore, the first of the two relevant stress tests does not undo the Court's preliminary conclusion --- that the failed FAA checkride, an "intervening event," was the sole cause of the Pilot's firing.

### 3.    Separating Out the Events

Come now to the second stress test of the Court's preliminary conclusion.

This one aims at sussing out whether there is some special difficulty in teasing apart the impact of the two causal events that are assertedly in the mix --- the Pilot's complaint about the Lead Pilot and the Pilot's failed FAA checkride. See Part III.F.3.

Did these potentially blur together, such that they may have been operating in a cumulative, mutually-reinforcing way? Did the Pilot's complaint perhaps produce hard-to-see effects, because they merged into (and thereby strengthened) the causal flow set off by the failed FAA checkride?

The Court's conclusion: none of this is an issue here, for three reasons.

### a.    Different in Kind

Separating things out can be hard when those things are similar to each other. It can be difficult to tell which pipe caused a flood when they both spew water.

But that is no complexity here.

Complaining about a co-worker is a long way from failing a test administered by a regulator.  These are different things, and plainly so.  The edges between them are sharp.  One does not naturally blur into the other.

Moreover, there is no evidence that separate things were run together here.  There is no proof, for example, that there was less patience for the Pilot's failed checkride because of his earlier complaint about the Lead Pilot.  And there is no evidence that discussions about whether to fire the Pilot were tinged in any way by his earlier complaint about the Lead Pilot.  The Pilot's complaint and the failed FAA checkride <u>could</u> have been folded together into the same mix.  But there is no sign they were.

### b.    The Coworker

The conclusion that the failed FAA checkride was a fully independent cause of the Pilot's firing, separate from his complaint, is underscored by the fact that the other person who failed the checkride (on the same day as the Pilot) was <u>also</u> fired (again, on the same day as the Pilot).  <u>See</u> Statement of Material Facts ¶ 74; Response to Statement of Material Facts ¶ 74.  That person had not previously complained about the Lead Pilot.  (Indeed, he was the Lead Pilot.)

If the employer-Defendant was nudged over the edge to firing the Pilot by the Pilot's complaint --- then the employer-Defendant would not <u>also</u> have fired his colleague, who made no complaint.

### c.    Relative Timing

Finally, it can sometimes be hard to tease apart the impact of two events that happen close in time to each other.  But again, not an issue here.

To see the broader point, take an example:

At Time 1, a municipal employee complains her town is discriminating based on religious practice.  At Time 2, she bungles an important assignment.  And at Time 3, she is demoted.

Recall that the length of time from Time 2 (doing a poor job) to Time 3 (being demoted) helps to shed light on whether the event at Time 2 caused the event at Time 3.  <u>See</u> Part III.D.1.

But the relative timing of all three events, at Time 1, Time 2, and Time 3, can be critical, too.

To see how, take Variant #1 on the municipal-employee example.

If the complaint at Time 1 came a year before the poor work performance at Time 2 --- then Time 1 does not look like it had any bearing on what happened at Time 3. After all, remoteness-in-time tends to undermine an inference of a causal link.

Now take Variant #2.

Assume the Time 1 complaint was made in the morning, and the poor work performance at Time 2 happened that afternoon. The time lapse from Time 1/Time 2 to Time 3 is, say, around ten days. If it seems that Time 2 could have caused Time 3, which followed ten days later, the same would be true of Time 1. After all, there is <u>also</u> a ten-day lapse between the event at Time 1 and the event at Time 3. And moreover: when things are happening at roughly the same time they sometimes blend together, and it can be harder to see what is there doing causal work and what is just there.

Common sense here is clear.

Variant #1 is a stronger case for an employer-defendant. The relative timing of the various events suggests the Time 2 event is doing the work.

And Variant #2 is a weaker case for an employer-defendant. The barely-there lapse between the Time 1 event and the Time 2 event makes it harder to say with confidence that it was the Time 2 event that caused the Time 3 event.

*    *    *

One way to express these common-sense intuitions is to use numbers.

Divide the time that runs from Time 1 to Time 3 by the time that runs from Time 2 to Time 3. That generates a ratio.

If the ratio is high, as in Variant #1, then the Time 1 event is relatively further from Time 3, and the Time 2 event is relatively closer to Time 3. That suggests that the intervening Time 2 event, being relatively nearer to what happened at Time 3, is likelier to have been the cause of the Time 3 event.

On the other hand, as in Variant #2, if the ratio is lower, then the opposite is the case.  The Time 1 event and the Time 2 event crowd onto each other --- and it is that much harder to say that one or the other caused the Time 3 event.[24]

\*     \*     \*

To see how a ratio can clarify the analysis, take Kier v. F. Lackland & Sons, LLC, 72 F. Supp. 3d 597 (E.D. Pa. 2014).

There, an employee complained to his manager about racial discrimination.  See id. at 602, 604.  Five days after that, the manager discovered an online review that accused the employee of cursing at a customer and calling him a drunk.  See id. at 603.  The employee was fired two days later.  See id. at 604.  The court concluded "that no reasonable juror could find in [the employee's] favor on the issue of causation" and granted summary judgment to the employer.  Id. at 619.

As noted, in Kier seven days ran from Time 1 (the discrimination complaint) to Time 3 (the firing).  And two days ran from Time 2 (the online review) to Time 3 (the firing).

That generates a ratio of 3.5 --- and shifting the facts of the case shows the usefulness of knowing the ratio.

Imagine a ratio that is pushed higher.  That can be done in any number of ways.  If, for example, 50 days instead of seven had run from Time 1 (the complaint) to Time 3 (the firing), that would have produced a ratio of 25.  And in that case, the common-sense intuition is clear: it is easier in the 25 case than in the 3.5 case to say that the event at Time 2 (the online review) --- not the earlier Time 1 event --- caused the event at Time 3.

Now make another tweak.  Imagine again that 50 days elapsed from Time 1 to Time 3, but that only part of one day (say, 12 hours)

---

[24]  In virtually all cases, a ratio of 1 will be the lower bound.  Occasionally, however, a court will find a causation-breaking event to have taken place before protected conduct.  See, e.g., Choy, 629 F. App'x at 365; Verdu v. Trs. of Princeton Univ., 2020 WL 1502849, at *9 (D.N.J. Mar. 30, 2020), aff'd, 2022 WL 4482457 (3d Cir. Sept. 27, 2022).  In such cases, the ratio would be lower than 1.

ran from Time 2 to Time 3.  The ratio would now be pushed higher yet, from 25 to 100.

The intuition holds: the Time 2 to Time 3 causal link is sharper and clearer in the case with the 100 ratio than in the case with the 25 ratio, just as it was sharper and clearer in the 25 case than in the 3.5 case.

The point: the higher the ratio, the likelier that, all else being equal, the causal connection runs from Time 2 to Time 3 -- and that Time 1 can be put aside, as sitting in the background but not doing any real work.

Now shift the ratio the other way.  Push it lower.  In <u>Kier</u>, the Time-1-to-Time-3 lapse was seven days and the Time-2-to-Time-3 lapse was two days, for a ratio of 3.5.  The <u>Kier</u> court concluded as a matter of law that Time 2, not Time 1, caused Time 3.  <u>See</u> <u>id</u>.

But the lower the ratio gets, the harder it becomes to think of Time 2 as the cause of Time 3.  Imagine if the run from Time 1 to Time 3 were two days shorter, and the lapse from Time 2 to Time 3 were one day longer.  That is a markedly harder case for the employer to defend.  And the ratio reflects that.  It would fall from 3.5 to 1.67.

*    *    *

To generalize the point:

A ratio can be produced by dividing the first lapse of time (from the earlier, protected conduct to the adverse consequence or decision) by the second lapse of time (from the intervening event to the adverse consequence or decision).  All other things being equal, the higher the ratio, the surer the conclusion that the intervening event caused the adverse consequence or decision.  The lower the ratio, the weaker the conclusion.[25]

---

[25]  This will not always make sense, especially when the numerator and denominator of the ratio are very large or very small in absolute terms.  For example, a ratio of 8 may clarify the situation when the protected conduct took place eight weeks before an adverse action and an intervening event took place one week before.  But a ratio is plainly less helpful if the protected conduct took place eight hours before the adverse action and the intervening event took place one hour before.

*    *    *

Now come back to this case.

The ratio here is 4.8.  This is because the time from the Pilot's statement about the Lead Pilot to the decision to fire him was 43 days.  See Part III.F.b.  And the time from the failed FAA checkride to the firing decision was nine days.  See Part III.

And in cases with a ratio of 4.8 or even lower, courts often find the intervening event to have caused the adverse employment consequence, with the preceding cause doing no meaningful work. See, e.g., Hankins, 237 F. App'x at 520-21 (so holding, with a ratio of 1.3); Yphantides, 660 F. Supp. 3d at 960 (same, ratio of 1.4); Marley, 2017 WL 2106125, at *6 (same, 1.6); Coggin v. Medline Indus., Inc., 2024 WL 4252777, at *1-2, *5 (N.D. Ill. Sept. 20, 2024) (same, around 2.5); Osborne v. Moody's Invs. Serv., Inc., 2018 WL 1441392, at *2, *6 (S.D.N.Y. Mar. 22, 2018) (same, around 2.7); Kier, 72 F. Supp. 3d at 605, 619 (same, around 3.5); Cole, 811 F. App'x at 170, 174 (4th Cir. 2020) (same, 4.3).

*    *    *

To wrap up: the second of the two stress tests does not dislodge the Court's preliminary conclusion that the failed FAA checkride, an "intervening event," was the cause of the Pilot's firing.  The intervening event (the failed checkride) and the earlier event (the complaint about the Lead Pilot) do not run into each other such that their effects are hard to tease apart. They are not similar to each other.  See Part III.F.3.a.  Their relative timing does not muddy the waters.  See Part III.F.3.c. And their separateness is only underscored by the different treatment of the Pilot (who complained, failed, and was fired) and the Crewmember (who complained, did not fail, and was promoted).  See Part III.F.3.b.

**G.    Conclusion**

The Court tentatively concluded that a reasonable jury could find only this: the Pilot was fired solely because of the failed FAA checkride, not because of his complaint about the Lead Pilot.  See Part III.E.

The Court has now stress-tested that conclusion from two perspectives, see Part III.F.2-3 --- and sees no reason to move away from its tentative conclusion.

Therefore, summary judgment must be granted to the employer-Defendant.  To avoid that result, the Pilot would have had to establish that his complaint about the Lead Pilot was a "a determinative factor" in the firing.  Kerrigan, 706 F. App'x at 771.  But the Court has concluded no reasonable jury could find it was.

## IV.  **Legal Theory Two: The Failed Checkride**

The Pilot also has a second legal theory that, he argues, supports his CEPA claim.

The theory: the Plaintiff failed the FAA checkride on purpose, because he did not want the Lead Pilot to pass.  See Opposition to Motion for Summary Judgment at 12-13.  Had he done otherwise, the Pilot argues, the Lead Pilot would have returned to the cockpit, which would have been dangerous.  See id. at 2-3, 10.  Therefore, the Pilot says, his checkride failure was protected by CEPA.  See id. at 16.

This argument does not work.

A "plaintiff must . . . establish that the employer knew of the protected activity."  Robles v. U.S. Env't Universal Servs., Inc., 469 F. App'x 104, 108 (3d Cir. 2012); see also Causal connection between protected activity and employer action, 18 N.J. Prac., Employment Law § 5.12 n.10 (2d ed.) (collecting cases); Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015) ("The plaintiff . . . cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.") (citation omitted); Martone, 2020 WL 3969919, at *5 ("[A] plaintiff must be able to demonstrate the employer knew the employee engaged in protected activity."); Harris, 2019 WL 5446299, at *14 ("Plaintiff presents no evidence whatsoever that Defendant . . . even knew about his alleged complaint."); Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 109 (2008) (stating that CEPA requires "a sufficient expression" of an employee's disagreement to put the employer on notice); Bowen v. Parking Auth. of City of Camden, 2003 WL 22145814, at *18 (D.N.J. Sept. 18, 2003); Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002) ("[F]or

protected conduct to be a substantial or motiving factor in a
decision, the decisionmakers must be aware of the protected
conduct."); cf. Dejewski v. Nat'l Beverage Corp., 2024 WL
2744981, at *8 (D.N.J. May 29, 2024) (noting that a jury could
find that parts of an email "amounted to an objection, and were
understood that way."); Boyle v. Quest Diagnostics, Inc., 2008
WL 2242443, at *7 (D.N.J. May 29, 2008) (holding that some
complaints can be too vague to pass muster under CEPA).

This legal principle is common sense --- an employer cannot
retaliate based on something it does not know about.

And this legal principle is fatal to the Pilot's second CEPA
theory.

No reasonable jury could conclude that the employer-Defendant
saw something that looks straightforward (a failed FAA test),
took from it something else entirely (that the failed test was
intentional, part of a plan to ground the Lead Pilot) --- and
then retaliated based on that understanding.

The reason: no evidence has been put before the Court that
supports this reading of events.

There is no evidence that anyone working for the employee had an
inkling that the Pilot's failed FAA checkride was an assertedly
intentional ploy, an effort to undermine the Lead Pilot.  See
Part III.D.3 (describing the employer-Defendant's decision-
making in the days after the failed checkride).

And there is no evidence that the Pilot himself said or
suggested anything along these lines --- until five months after
he was fired.  See Opposition to Motion to Dismiss, Exhibit 21;
Opposition to Motion for Summary Judgment at 27.

Indeed, the available evidence affirmatively undermines the
Pilot's argument that he sabotaged his own checkride to ground
the Lead Pilot.  During the checkride, the Defendant's assistant
chief pilot saw the Pilot trying to help the Lead Pilot, see
Deposition of Chris Meadows 109:14-20, rather than refuse to do
so in the name of safety.  And the FAA Check Pilot, a third-
party observer, had the same impression.  See Landrum Deposition
46:2 to 47:6, 83:7 to 84:10.

Look to a relevant case, Haworth v. Deborah Heart & Lung Center,
271 N.J. Super. 502 (App. Div. 1994).

There, a blood-bank supervisor was fired for destroying blood samples. He sued under CEPA, claiming that "his destruction of the blood samples was a communicative act," a refusal to take part in his employer's defective practices. Id. at 503. The Law Division granted summary judgment for the employer, and the Appellate Division affirmed. Part of the rationale: the plaintiff failed to say anything of his asserted motives until the next day. See id. As far as anyone knew at the time, the destruction of the blood samples was just vandalism.

So too here. The Pilot's FAA checkride looked like a failed test and was treated as that by the employer-Defendant. But the Pilot's second CEPA theory rests on an entirely different premise: that the failed checkride was really about something else, and that the employer-Defendant (a) knew that and (b) retaliated based on that knowledge.

This argument fails as a matter of law. It is not supported by any evidence.

## V.    Conclusion

The Defendant's motion for summary judgment is granted. The Plaintiff was fired because of his failed FAA checkride, not his earlier statement about a colleague. See Part III. And there is no evidence that the Defendant was aware then of what the Plaintiff says now --- that the failed FAA checkride was actually an effort to protect the public. See Part IV.

IT IS on this 19th day of December, 2024, **SO ORDERED.**

Michael E. Farbiarz, U.S.D.J.